UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

BRIAN PFAIL,

                             <u>MEMORANDUM AND ORDER</u>
                             16-CV-518 (NRM)

                   Plaintiff,

       -against-

COUNTY OF NASSAU, NASSAU COUNTY
POLICE DEPARTMENT, POLICE OFFICER
JOSEPH MASSARO, in his individual and
official capacity, POLICE OFFICER
JONATHAN PANUTHOS, in his individual and
official capacity, POLICE OFFICER KARN C.
O'BRIEN, in her individual and official capacity,
SERGEANT THOMAS IANNUCCI, in his
individual and official capacity, and JOHN
DOES 1-10, in their individual and official
capacities,

                   Defendants.
------------------------------------------------------------------x

NINA R. MORRISON, United States District Judge:

      Defendants move the Court to set aside the verdict and order a new trial in

this matter under Federal Rules of Civil Procedure 50 and 59. Defendants also

move for remittitur of the jury's compensatory and punitive damages. For the

reasons outlined below, Defendants' motions are denied in their entirety.

**<u>BACKGROUND</u>**

      Because the parties are familiar with the background of this case, the Court

only briefly recounts the facts necessary for the disposition of the instant motions.

1

This case arises from an incident on November 3, 2014 at the Fairway Supermarket in Westbury, New York, during which Plaintiff Brain Pfail ("Pfail" or "Plaintiff") was forcibly restrained by four officers from the Nassau County Police Department ("NCPD") and then placed under arrest.  Plaintiff brought this action alleging, *inter alia,* that police officers Joseph Massaro ("Massaro"), Jonathan Panuthos ("Panuthos"), Karen O'Brien ("O'Brien"), Sergeant Thomas Iannucci ("Iannucci"), and the NCPD (collectively, "Defendants") violated both federal and state law by engaging in excessive force, malicious prosecution, abuse of process, and battery against him.

Several of the Court's pretrial rulings are pertinent here.  First, the Court received briefing and held argument on May 6, 2025, on whether Plaintiff's expert, Dr. N.G. Berrill, should be permitted to testify as to certain damages that he concluded Pfail suffered from the incident.  This Court ultimately denied Defendants' *Daubert* motion to preclude Dr. Berrill's testimony.  Relatedly, Defendants sought to call Dr. Berrill as a witness during the liability stage of the trial so that they could question him on certain aspects of his earlier testimony from Pfail's criminal trial in 2018.  The Court similarly denied that motion.  Finally, Defendants moved to preclude questioning about the officers' conduct with respect to their failure to preserve certain pieces of evidence — a sweater, and a video of the incident allegedly recorded by a bystander.  The Court also denied that motion.

A jury trial lasting ten days was conducted between May 14 and May 28. During the liability stage of the trial, all four officers testified as to the events of the

2

night in question, claiming that they identified themselves as police officers, and that Pfail resisted their lawful actions to restrain and arrest him. *See* Trial Tr. at 82–175, 402–53, 528–58, 592–662. Pfail testified that he was not aware that the officers were indeed officers, and that at the time he believed that unknown persons had jumped out of a car and attacked him, unprovoked. *See id.* at 769–806. The jury was shown two videos of the incident, one taken from the parking lot, and another from the internal vestibule of the supermarket. *See* Pl. Ex. 74A, 81. The jury also viewed stills from that video, as well as photos of Pfail and the officers following the incident. *See* Pl. Ex 86, Def. Ex. BBBBB, CCCCC, DDDDD.

At the close of the liability phase of the trial, the jury found Defendants liable on all counts. Defendants moved for a judgment as a matter of law under Rule 50, which this Court denied. *See* Trial Tr. at 948–80.

Trial then proceeded to the damages phase, where both Pfail and his mother, Eileen, testified about how the event had negatively impacted him and affected his daily functioning. *See id.* at 1375–99, 1416–41. Dr. Berrill also testified regarding a pre-existing traumatic brain injury and other injuries that Pfail had sustained from an unrelated incident in 2007, and how, in Dr. Berrill's assessment, those pre-existing injuries were exacerbated by Pfail's 2014 encounter with the officers. *See id.* at 1616–63. The jury awarded Plaintiff $1,860,000 in compensatory damages. The jury also awarded $293,580 each in punitive damages against Officers Panuthos and Massaro and Sergeant Iannucci, and $143,550 against Officer O'Brien, for a total of $1,024,290.

Defendants now move under Federal Rules of Civil Procedure 50 and 59 to set aside the verdict and jury awards.

## DISCUSSION

### I.    Rule 59

Rule 59(a)(1)(A) allows the Court to grant a new trial if, "after a jury trial, for any reason for which a new trial has heretofore been granted in in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The rule permits the Court to grant a new trial if the verdict is against the weight of the evidence, which can happen "if and only if the verdict is (1) seriously erroneous or (2) a miscarriage of justice." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417–18 (2d Cir. 2012) (internal quotation omitted). This is a high bar, and a request for a new trial under Rule 59 "ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98, 106 (2d Cir. 2002) (quoting *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 623–24 (2d Cir. 2001)).

The standard applied in reviewing a Rule 59 motion "depends on whether that party objected contemporaneously to the purported errors." If a party objects contemporaneously, a new trial is warranted only if "the district court committed errors that were a 'clear abuse of discretion' that were 'clearly prejudicial to the outcome of the trial.'" *Marcic v. Reinaurer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005) (quoting *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 17 (2d Cir.

4

1996)).  If the claimed errors were not preserved, "a new trial will be granted only for error that was 'so serious and flagrant that it goes to the very integrity of the trial.'"  *Id.* (quoting *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 51 (2d Cir. 1998)).

Defendants challenge four of this Court's rulings under Rule 59.  The Court addresses each in turn.

A.  Dr. Berrill's Criminal Trial Testimony

Defendants first argue that the Court erred in not allowing them to impeach Dr. Berrill with certain statements from his testimony at Pfail's criminal trial in 2018.  According to Defendants, Dr. Berrill testified at the prior criminal trial that one effect of Pfail's prior traumatic brain injury ("TBI") from 2007 is that "Plaintiff would strike out impulsively."  Def. Mem. at 11.[1]

This issue was argued extensively prior to trial, and this Court stated its reasons for denying Defendants' request on the record on May 12.  As expressed in that ruling, the Court does not agree that Dr. Berrill's criminal trial testimony supports the inference that Pfail was likely to strike out impulsively during his encounter with Defendants in 2014.  Rather, Dr. Berrill testified that people with Pfail's condition may demonstrate poor impulse control, that they might "become overly emotional" and respond with "irrational behavior" when faced with circumstances similar to the original trauma, Def. Ex. B at 8–9, and that Pfail's

---

[1] The Court refers to the page numbers assigned by the Electronic Case Filing System ("ECF").

impulse control and emotional regulation were so affected on the night of this incident, *id.* at 11.

Moreover, even if the criminal trial testimony were construed to suggest that Pfail had some general tendency to lash out or strike out because of his earlier brain injury, it was properly excluded under Rule 404(a)(1) and Rule 403.[2] Defendants now argue that even if this is character evidence, it was admissible for the purpose of "challenging witness credibility," not to show that Pfail acted in accordance with that character trait. *Tang Cap. Partners, LP v. BRC Inc.*, No. 22-CV-3476 (RWL), 2025 WL 1785245, at *4 (S.D.N.Y. June 27, 2025). As Defendants state in their post-trial memorandum of law, the officers "testified that Plaintiff verbally challenged their authority and indicated that he would not comply with their lawful order. Conversely, Plaintiff . . . denied challenging them." Def. Mem. at 15. Defendants conclude that this evidence would undermine Pfail's testimony as it may have "swung the balance in favor of the Officers as Dr. Berrill's testimony lends credence to the Officers' version of the initial interaction with Plaintiff." *Id.*

What Defendants describe is still Rule 404(a)(1) evidence. While Defendants purport to merely impeach Pfail's credibility, they do so only by arguing that Pfail has a trait which made it more likely that it was the officers who were telling the truth about his actions, and not Pfail. That is precisely what is prohibited by Rule 404(a)'s bar on the introduction of character evidence. *See Micone v. Sarene Servs.*

---

[2] Defendants also argue that this evidence was improperly excluded under Rule 404(b). The Court does not address this argument, as it did not exclude the evidence based on Rule 404(b).

*Inc.*, No. 2:20-CV-3273 (NJC), 2025 WL 736638, at *45 n.25 (E.D.N.Y. Mar. 8, 2025) (noting that evidence that a person acted in accordance with a character trait "tends to distract the trier of fact from the main question of what actually happened on the particular occasion at issue in the trial" (internal quotation omitted)).  Indeed, to allow any evidence that supports one side's account over another under the guise of "credibility" would be to completely vitiate Rule 404(a)(1), as it would allow a party to introduce character evidence simply because a witness testified that he or she acted in a manner that is inconsistent with that alleged character.

The very case Defendants cite on this point, *Tang Capital*, recognizes this distinction.  *Tang Capital* allowed the admission of character evidence to challenge the credibility of a claim that a party was "difficult, angry, and impersonal," but only for the limited purpose of allowing the jury to "properly weigh testimony from [other] witnesses who may be influenced by their employment relationship with him." *Tang Capital*, 2025 WL 1785245, at *4.  In other words, it was not introduced to show that Tang acted in accordance with his alleged character on a particular occasion, as Defendants try to argue here, but rather to show that other testifying witnesses may have been intimidated by Tang's reputation, which would go to *their* credibility.

 Lastly, Defendants argue that because the testimony was allowed in the previous criminal trial under Rule 404(a)(1), it is by definition admissible in this civil trial.  Def. Mem. at 13–14.  However, Defendants point to no caselaw — nor is the Court aware of any — suggesting that an evidentiary ruling in a criminal case

7

in a different jurisdiction, involving different claims and different burdens of proof, binds a federal court in a subsequent civil case brought by one of those parties.

Finally, this Court reaffirms its previously articulated reasons for excluding this evidence under Rule 403.  *See* Pl. Ex. 6.

B.  Sweatshirt and the "Cart Wrangler"

Defendants next argue that the Court erroneously allowed Plaintiff to present evidence that Officer Massaro disposed of his bloody sweatshirt immediately after the incident, and that the officers did not preserve any video from the eyewitness who called 911 about the incident, who was referred to at trial as the "cart wrangler."  This issue, too, was argued extensively prior to trial, and this Court denied Defendants' oral motion to preclude inquiry about the sweatshirt and the cart wrangler's video.

Defendants' argument largely rests on a body of caselaw concerning spoliation, arguing that there was no duty to preserve the evidence for future use in a civil case.  *See* Def. Mem. at 16–17 (citing *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001); *Chepilko v. Henry*, 722 F. Supp. 3d 329, 337 (S.D.N.Y. Mar. 21, 2024)).  However, whether or not there was a duty to preserve the evidence for civil litigation is a completely separate question from whether or not the officers' actions in failing to preserve the evidence were relevant to the factual disputes before the jury on Plaintiff's malicious prosecution claims, as well as to the officers' overall credibility.  Defendants essentially claim that any action a police officer

takes is irrelevant to the jury's inquiry in a civil rights trial unless that action was contrary to some other legal duty. None of their cited cases hold as much.

For example, *Marshal v. Port Authority of New York & New Jersey* concerned spoliation sanctions, but its discussion of the relevance of the unpreserved video does not apply to the case at hand. No. 19-CV-2168 (LJL), 2022 WL 17491006, at *8 (S.D.N.Y. Dec. 5, 2022). In *Marshal*, the Court found that the unpreserved video would not be relevant to the civil case because the operative question in the civil case was whether or not the plaintiff was verbally asked to present a ticket, and the unpreserved video tape would not have had audio. *Id.* *Savino v. City of New York* is similarly inapposite, as it does not involve the destruction or spoliation of evidence. *See* 331 F.3d 63 (2d Cir. 2003).

Defendants argue that the evidence here was not relevant because the "cell phone video . . . did not capture the incident" and the sweatshirt was "not shown to contain exculpatory material content." Def. Mem. at 18. However, the only testimony that the eyewitness's video did not capture the incident came from the officers themselves. Given that the officers nonetheless failed to preserve the video, and evidence was presented that the cart wrangler had told them that it *did* capture the incident, it was perfectly permissible for the jury to draw an adverse inference about the officers' decision not to preserve the video, as well as Massaro's intentional disposal of the sweatshirt.

For these reasons, this Court finds no error or an abuse of discretion in allowing this evidence to be presented, nor in declining to give a curative instruction.

C.  Dr. Berrill's Testimony

Defendants next claim that the Court abused its discretion in denying their motion to preclude Dr. Berrill's testimony at this trial and declining to strike the testimony after it was given.  Defendants largely make the same arguments they made in their original *Daubert* motion to exclude Dr. Berrill's testimony.  *See* ECF No. 103.  That motion was denied in an oral ruling on May 6, 2025, *see* Pl. Opp. Ex. 5, and nothing in Defendants' Rule 59 motion now warrants reconsideration.  *See* Pl. Opp. Ex. 5.  The Court will not restate that lengthy ruling here, but will explain why, in light of the actual testimony given, it was not an abuse of discretion to allow Dr. Berrill to testify and decline to strike his testimony.

Defendants' primary complaint with Dr. Berrill's testimony, as in their original motion, appears to be that Dr. Berrill had no "objective data" to determine that Defendants' actions caused Pfail to sustain a second TBI and additional damages.  Def. Mem. at 22.  It is unclear what Defendants mean by "objective data," especially in the field of neuropsychology.  As explained in the oral ruling on May 6, *Daubert* does not preclude Dr. Berrill from relying on Pfail's self-reporting in lengthy clinical interviews, in combination with pre-2014 medical records, to form his opinion.  Defendants' newly cited cases do not change this analysis.

10

*Shabreskis v. Bridgeport & Port Jefferson Steamboat Co.*, No. 02-CV-2692 (DRH), 2008 WL 2001877 (E.D.N.Y. May 8, 2008), did not concern a *Daubert* challenge, and dealt with medical records, not expert testimony. And in *Shabreskis*, the doctors appeared to rely only on the plaintiff's self-reporting, without reference to any other evidence of the plaintiff's condition. Similarly, in *Johnson v. United States*, the court excluded expert opinion on causation of injury because the purported medical expert—who only analyzed the plaintiff post-accident—testified that he had not reviewed any medical records besides his own. No. 21-CV-2851 (MKB), 2024 WL 1246503, at *5 (E.D.N.Y. Jan. 16, 2024) ("It is undisputed that [the expert] was not aware of Plaintiff's pre-Accident history . . . ."). In addition, *Johnson* did not involve a neurological injury.

By contrast, Dr. Berrill told the jury that in reaching the conclusion that the 2014 incident exacerbated Pfail's condition, he relied not only on Pfail's self-reporting, but also on Pfail's past medical records. *See* Trial Tr. at 1632; 1677. Dr. Berrill explained that included in these medical records were reports that Pfail's 2014 injury was "either a concussion in some cases or a second TBI." *Id.* at 1648. Defendants cite no caselaw that indicates an expert must rely on anything more, let alone "objective testing," before the expert can offer a neuroscientific opinion that a plaintiff suffered from a TBI.

Defendants were also free to cross-examine Dr. Berrill on the fact that he did not have the benefit of so-called "objective testing" from before the 2014 incident, and they did, extensively. Dr. Berrill responded that Defendants' questions were

presuming those tests measured something that "those tests aren't designed to do." *Id.* at 1699. He stated that there is "no objective psychological testing you could [do] that could help you make that differential." *Id.* at 1706. Defendants also had the option to call their own retained expert — who had also reviewed these records and interviewed Pfail — to refute Dr. Berrill's methodology and opinion, but they chose not to do so.

Finally, to the extent that Defendants argue that Dr. Berrill's testimony is unreliable because he did not know about the 2013 incident with the Garden City police and he did not review *all* of Pfail's medical records, this is a classic topic for cross examination, not a basis to exclude or strike his testimony. *See Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*, No. 08-CV-0931 (PKC), 2014 WL 12788845, at *6 (E.D.N.Y. Mar. 31, 2014) ("Any failure to take a given piece of evidence into account in [the expert's] analysis would affect only the weight of his testimony, not its admissibility."); *Simpson v. New Prime, Inc.*, No. 15-CV-5392 (VMS), 2022 WL 17961213, at *2 (E.D.N.Y. Dec. 27, 2022) ("The alleged failure to examine certain medical records also does not make the experts' opinion inadmissible."). This Court gave Defendants ample opportunity to vigorously cross-examine Dr. Berrill on this issue — which, again, they did. *See, e.g.,* Trial Tr. at 1800 ("Q: [Y]ou didn't review any records about [the Garden City arrest], right? A: I don't think that I did review records about it."). In short, for the same reasons originally outlined in the May 6 ruling, and with the additional benefit of Dr.

12

Berrill's trial testimony, this Court finds no abuse of discretion or error in allowing Dr. Berrill to testify.

### D. Dr. Grix's Records

Lastly, Defendants argue that the Court abused its discretion and violated Rule 37(c)(1) by precluding them from offering 900 pages of records by Plaintiff's former therapist, Dr. Grix, after they were produced on the eve of trial in this nine-year-old case. On May 22, this Court issued a lengthy decision on the matter after written submissions and oral argument from the parties. The Court will not retread its earlier application of the *Patterson* balancing test, *see Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006), but will now address a few of the arguments Defendants raise in their Rule 59(e) papers.

First, Defendants take issue with this Court's reliance on *Klonski v. Mahlab*, 156 F.3d 255 (1st Cir. 1998), and *Haas v. Delaware & Hudson Railway Co.*, 282 F. App'x 84 (2d Cir. 2008), because the prejudice in those cases was not the same as here. *See* Def. Mem. at 27–28. However, this Court relied on those cases in analyzing the "explanation for the discovery violation" prong of the *Patterson* test, not the prejudice prong. *See* Trial Tr. at 1233–35.

Defendants also argue that unlike here, the cases cited in the Court's prior ruling, like *Lujan v. Cabana Management, Inc.*, 284 F.R.D. 50 (E.D.N.Y. 2012), dealt with "actual" surprise. *See* Def. Mem. at 28. But as already explained, this was actual surprise, just in a different form. This is because while Plaintiff may have been aware of the *existence* of Dr. Grix as a witness, the 900 pages of

13

documents from her file were not produced by Defendants nor identified as potential trial evidence until long after the close of both lay and expert discovery, and approximately three weeks before trial. *See Lujan*, 284 F.R.D. at 71 (finding prejudice where documents that defendants intended to rely upon were newly produced, "depriving plaintiffs of the ability to challenge" them); *Jablonski v. Special Counsel, Inc.*, No. 16-CV-5243 (AT), 2025 WL 315884, at *4 (S.D.N.Y. Jan. 27, 2025) ("Plaintiff's late production is not harmless because it prevents Defendant from inquiring at a deposition or otherwise investigating the evidence offered by [the opposing party], and therefore prejudices Defendant." (internal quotation omitted)). Thus, Defendants' argument that admitting the records would have been "harmless" is baseless.

Defendants then argue that the Court failed in its obligation to "require a demonstration by Plaintiff that he would somehow be unfairly prejudiced by these records." Def Mem. at 30. They even go so far as to claim that the Court "*did its best* to *avoid an assessment* of how Plaintiff might be prejudiced." *Id.* (emphasis added). This Court has reviewed the trial record once more, and finds no reason to conclude that it did not fairly consider whether and how Plaintiff might actually be prejudiced by allowing Defendants to cherry-pick from 900 pages of newly disclosed exhibits from Plaintiff's former therapist and use them at trial at the eleventh hour. Such potential prejudice included, but was not limited to, what could result from allowing Defendants to cross examine Plaintiff about statements or events

14

attributed to him in therapy notes from a decade earlier that were never raised in discovery or prior motion practice.

In addition, *Patterson*'s third prong requires the Court to consider "the prejudice suffered by the opposing party as a result of having *to prepare to meet the new testimony*." 440 F.3d at 117 (emphasis added). Plaintiff's counsel sufficiently outlined the prejudice to trial preparation and otherwise that would result from receiving 900 pages of documents that Defendants sought to use at trial just three weeks before jury selection in this nearly decade-old case. *See* Pl. Ex. 5 at 26–27.

The Court thus re-affirms its prior ruling that the failure to timely disclose these documents was not "harmless." It finds no error in its decision precluding these exhibits.

## II.    Rule 50

The Court now turns to Defendants' claims under Federal Rule of Procedure 50 — their renewed motion for judgment as a matter of law under Rule 50(b). This motion is denied for the same reason it was denied at the close of evidence. As this Court stated at the beginning of that prior ruling, "[t]his case is at its heart a contest of credibility," Trial Tr. at 974, and the jury was permitted to credit as much or as little of the officers' or Pfail's testimony as it saw fit.

"Under Rule 50(b), if a jury returns a verdict for which there is not a legally sufficient evidentiary basis, the Court may either order a new trial or direct the entry of judgment as a matter of law." *Protostorm, LLC v. Antonelli, Terry, Stout & Krauss, LLP*, No. 08-CV-931 (PKC), 2015 WL 3605143, at \*2 (E.D.N.Y. June 5,

15

2015).  A Rule 50 motion "may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been a result of sheer surmise and conjecture, or the evidence in favor of the movant[s] is so overwhelming that reasonable and fair-minded [persons] could not arrive at a verdict against [them]." *Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)).

In deciding a Rule 50 motion, a court "must give deference to all credibility determinations and reasonable inferences of the jury." *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 51 (2d Cir. 2000) (quoting *Galdieri-Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998)).  As such, it must "consider the evidence in the light most favorable to the [non-moving] party and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in [its] favor from the evidence." *Concerned Area Residents for the Env't v. Southview Farm*, 34 F.3d 114, 117 (2d Cir. 1994) (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir. 1988)).  The Supreme Court has explained that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

One legal rule that provides important context for Defendants' Rule 50(b) claims is that "the court must bear in mind that the jury is free to believe part and disbelieve part of *any* witness's testimony." *Zellner v. Summerlin*, 494 F.3d 344,

16

371 (2d Cir. 2007) (emphasis added).  Much of Defendants' Rule 50(b) motion revolves around excerpts from the trial in which the officers testified to their version of what occurred at a specific moment during the parties' encounter, while Pfail could not remember some or all of what transpired at that exact moment. Defendants argue that the officers' testimony in such cases established an uncontroverted fact that the jury was compelled to credit.  *See* Def. Mem. at 33. This is simply not the law.

The jury heard from each of the officers and observed their demeanor on the stand.  The jury also did not hear that testimony in a vacuum.  It weighed the officers' testimony alongside other evidence — including the videos, the 911 call, and photographs — and compared their testimony to Pfail's entire testimony.  The jury was completely within its right to make credibility determinations as to each officer, and credit all, some, or none of their testimony, whether or not a specific thing the officer said was directly controverted by Pfail's testimony on that same fact.  *See United States v. Paddy*, 725 F.3d 147, 152 (2d Cir. 2013) ("The jury is free to believe part, and to disbelieve part, of any given witness's testimony."); *Salters v. New York City Transit Authority*, 12-cv-4836 (OEM) (JRC), 2025 WL 1504122, at *10 (E.D.N.Y. May 27, 2025) (finding that the jury "was free to credit some or all of [the witness's] respective testimony," and that "[t]he jury was also not required to believe either side").

The Court now turns to the individual claims on which Defendants seek judgment as a matter of law under Rule 50.

17

A. Malicious Prosecution

Defendants argue that they are entitled to judgment as a matter of law on the malicious prosecution claim because no reasonable jury could have found that they lacked probable cause to arrest Pfail for resisting arrest and assault in the second degree.

It is true that "the existence of probable cause is a complete defense to the claim of malicious prosecution in New York." *Stansbury v. Wertman*, 721 F.3d 84, 94–95 (2d Cir. 2013) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 161–62 (2d Cir. 2010)). However, the jury was so instructed, and it reasonably found that the officers did not have probable cause to arrest Pfail on either charge. Defendants' claim relies entirely on an interpretation of the facts most favorable to them, as opposed to drawing all reasonable inferences in favor of the non-moving party.

Defendants emphasize that probable cause is an objective test of what the officers knew at the time, not Pfail's subjective understanding of what happened. *See Zellner*, 494 F.3d at 369. But that did not require the jury to accept everything that the officers testified to as true, nor to accept the officers' subjective interpretations of objective facts. *See id.* ("An arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." (internal quotation omitted)).

1. Resisting Arrest

18

The jury was instructed that "a person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer from effecting an authorized arrest of himself.  Intent means that the person had a conscious objective or purpose."  Trial Tr. at 1182; N.Y. Penal Law § 205.30.  Defendants' argument that the officers had probable cause to arrest Pfail for resisting arrest as a matter of law improperly relies entirely on an interpretation of the trial evidence most favorable to them.

The officers testified that they identified themselves as police officers and said they wanted to speak with Pfail, and additionally, that they had their badges around their necks.  *See* Trial Tr. at 208, 465, 709, and 861.  They stated that Pfail swung his arm at them as they approached him, *id.* at 129, and took a "quick step to the left, which [was] interpreted [as] he was going to flee," *id.* at 707.  The officers then testified that after Pfail was on the ground, he "didn't put his hands behind his back.  He was kicking his legs up . . . [he was] resisting arrest instead of cooperating."  *Id.* at 246.

But whether the defendants actually identified themselves as police officers was very much a fact in dispute.  Pfail testified that a car pulled up, and three men came out — three men whose identities he did not know.  *Id.* at 779.  Though he heard the men yelling, *id.* at 860, he did not know what was being said, *id.* at 861.  Pfail testified that the three men ran towards him and he "braced for impact."  *Id.*  He stated that he did not make any contact with the men, and then the foot of one of the men struck him in the abdomen.  *Id.* at 782.

19

Pfail then testified that in the vestibule of the Fairway Market, he "hit the ground, [he] felt like the wind was knocked out of [him,] and [he] was having a hard time breathing because [he] could feel that these men were on top of [him] and [he] felt the punching, [he] felt something very blunt hit [him] in the back of the head numerous times, and [he] felt someone taking [his] head and slamming it into the floor of the vestibule." *Id.* at 783. Pfail then heard a woman yell "break his leg," and felt a man bend his leg backwards as he begged them to stop. *Id.* at 783–84. And as he was on the floor, he remembered the "pounding on [his] head" and not being sure "what was going to happen if it didn't stop and [that he] was afraid [he] was going to die." *Id.* at 784. The jury was free to credit Pfail's testimony regarding these events and discredit the officers' testimony.

The jury also watched the video of the incident from outside of the Fairway. *See* Pl. Ex. 74B. In that video, there are approximately five seconds from the moment Officer Panuthos comes around the back of the vehicle to the moment the officers make contact with Pfail and eventually tackle him into the vestibule of the Fairway. *Id.* at 00:08–00:13. Additionally, the officers are in plainclothes, and the vehicle is an unmarked black SUV. *Id.* The video, combined with Pfail's testimony that he could only hear yelling, taken in the light most favorable to Pfail, is surely enough to for a reasonable jury to infer that no reasonable officer in Defendants' position would have believed that the individual they approached and immediately tackled was aware they were police officers and thus had the conscious objective to resist arrest.

20

Moreover, the jury heard a 911 call from the so-called cart wrangler, a person who was witnessing the event contemporaneously, and who told the operator that "*these three guys just jumped out of this car and started beating this one guy.*"  Pl. Ex. 81 00:12–00:16 (emphasis added).  It was a perfectly reasonable inference for the jury to make that, because the 911 caller also could not tell that the Defendants were police officers attempting to make an arrest, the officers did not reasonably identify themselves as such, and thus any "defensive" posture that Pfail may have had was a reasonable reaction to an  unprovoked attack such that the officers could not have reasonably believed he was resisting a lawful arrest.

Not only that, even when uniformed officer O'Brien went to help the other officers, the 911 caller said that "the officer seems to be fighting these guys off right now, you might wanna — need another officer here right now.  They keep beating — this officer's struggling — they need backup right now." *Id.* at 1:00–1:10.  A reasonable jury could have inferred that the 911 caller at that moment *still* believed the plain-clothed officers were not in fact officers, and that they were themselves criminals fighting off Officer O'Brien as they attacked Pfail.  That may not be the only reasonable interpretation of the evidence, but it is certainly one the jury could have made.

Defendants' argument that no reasonable jury could come to the conclusion the officers did not have probable cause to arrest Pfail for resisting arrest while inside the Fairway vestibule suffers from the same defects.  Pfail testified that he was not resisting arrest, only attempting to defend himself from what he perceived

21

as an unprovoked attack.  The video inside the Fairway Market vestibule also shows the three officers putting their body weight on top of Pfail as he tries, unsuccessfully, to protect his body and move his arms and legs while pinned underneath them.  *See* Pl. Ex. 74A at 00:12.  A reasonable jury could certainly find that this video supported Pfail's version of the events.

Furthermore, an individual has the legal right to act in self-defense when faced with officers who are using unreasonable force against him.  As the New York Court of Appeals has stated, "[t]here can be no cavil with the proposition that a citizen may use reasonable force in self-defense where the force exerted by the police in effecting an arrest is excessive.  Nor can there be any doubt that force used by the police may reach such dimensions as to be illegal." *People v. Stevenson*, 31 N.Y.2d 108, 112 (1972) (internal citations omitted); *see also McLaurin v. Falcone*, No. 05-4849-cv, 2007 WL 247728, at *1 (2d Cir. Jan. 25, 2007) (summary order) ("[I]t is well-established that '[t]he purpose of [N.Y. Penal Law § 35.27] is merely to prevent combat arising out of a dispute over the validity of an arrest and does not prevent an individual from protecting himself from an unjustified beating.'" (quoting *People v. Sanza*, 323 N.Y.S.2d 632, 633 (N.Y. App. Div. 1971)).  A jury could have inferred that the video evidence, combined with Pfail's testimony and the 911 caller's statements, made clear that Pfail was not resisting arrest but rather protecting himself from the use of excessive force, and that no reasonable officer could have believed that he was simply resisting a lawful arrest.

Indeed, Defendants in their motion argue that "it took about three minutes and five people working together to get Plaintiff into handcuffs." Def. Mem. at 33. But by the two-minute nine-second mark in the video, Pfail appears to be completely motionless face down on the floor. *See* Pl. Ex. 74A at 2:09. And after he is cuffed, the video shows him being rolled over while appearing almost lifeless, with a large pool of blood on the floor where his head had been.

Probable cause is an objective analysis, not a subjective one. However, an element of the crime of resisting arrest is that the arrestee has an *intent* to resist arrest. Based on all the facts presented at trial, and drawing all reasonable inferences in favor of Pfail, it was reasonable for the jury to conclude that the officers did not have probable cause to believe that Pfail was acting with the intent to resist arrest.

       2.  <u>Assault in the Second Degree</u>

The jury was instructed that a person is guilty of assault in the second degree "when, with the intent to prevent a police officer from performing a lawful duty, he causes physical injury to such a person. Intent means that the person had a conscious purpose or objective. Physical injury means impairment of physical condition or substantial pain." Trial Tr. at 1181; *see* N.Y. Penal Law § 120.05. For largely the same reasons just outlined as to why a reasonable jury could have concluded the officers had no probable cause to believe Pfail was resisting arrest, a reasonable jury could have concluded the officers similarly lacked probable cause for second degree assault. Namely, a reasonable jury could have concluded that the

23

officers did not identify themselves, such that Pfail did not know they were police officers and therefore lacked the intent to stop any officer from performing a lawful duty.

Defendants argue simply that because the officers each testified as to sustaining injuries during the arrest, they necessarily had probable cause to arrest Pfail for assault in the second degree. *See* Def. Mem. 34–35. However, the jury was entitled not to credit the officers' testimony about how they actually sustained those injuries. Additionally, while it is true that Pfail acknowledged that at some point when he was on the ground he was "trying to defend himself," Trial Tr. at 871, that does not mean that the officers had probable cause to arrest him for assault in the second degree.

The jury could have reasonably found, for example, that the officers attacked Pfail without provocation and without properly identifying themselves, and that Pfail was lawfully attempting to defend himself from grievous physical injury. Further, the jury found Panuthos, Massaro, and Iannucci liable for use of excessive force and assault. And if the officers were using excessive force, their actions were no longer "lawful," *see Stevenson*, 31 N.Y.2d at 112, and any actions Pfail took to defend himself would not have been with the intent to stop the officers from performing a lawful duty.

Defendants highlight the fact that Pfail did not deny Officer O'Brien's allegation that he kicked her; as he explained, after sustaining a second TBI in 2014, he could not remember that portion of the incident one or way or another. *See*

24

Trial Tr. at 550.  But the jury was free to make credibility determinations and to

disbelieve all or part of Officer O'Brien's testimony, especially in light of other

aspects of her testimony.  *See United States v. Miller*, 116 F.3d 641, 676 (2d Cir.

1997) ("[W]here there are conflicts in the testimony, we must defer to the jury's

resolution of the weight of the evidence and the credibility of the witnesses.").  For

example, Officer O'Brien claimed that, upon arriving at the scene, Panuthos,

Massaro, and Iannucci all looked "like they just got their asses kicked."  Trial Tr. at

560.  On the other hand, she testified that Pfail looked to her like he had somehow

managed, on his own, to physically dominate these three police officers.  *See* Trial

Tr. at 570 (Q: "[I]t's your testimony that it looked like Mr. Pfail was doing the ass

kicking? A: It looked like he did it before I arrived.").

However, the jury watched the video from inside the Fairway, which showed

that when Officer O'Brien arrived, Pfail had already been on the ground under the

three officers for approximately one minute.  *See* Pl. Ex. 74A at 1:25.  Then, after

about two minutes, all the officers are standing while Pfail lies motionless on the

ground, and Pfail is rolled over, leaving a large pool of blood where his head was.

*See id.* at 3:05–3:22.  The jury also saw pictures of Pfail after the incident, showing

a large gash on his head that had to be stapled shut, *see* Pl. Ex. 86, and could

compare those to the photos of the officers taken, which showed only some light

redness and mild swelling, *see* Def. Ex. BBBBB, CCCCC, DDDDD.

This evidence could have led a reasonable jury to agree with Plaintiff's

counsel's argument in summation that Officer O'Brien's claims about how the

respective parties looked when she arrived were so incredible and biased that other aspects of her testimony, including her claim that she was kicked by Pfail, were not worthy of belief. *See* Trial Tr. at 1146 (arguing that O'Brien showed "her true stripes" on the witness stand when she falsely claimed that her fellow officers looked like they had been badly beaten by Pfail, rather than vice-versa); *id.* at 1150. Thus, there is no cause to disturb the jury's finding that Defendants lacked probable cause to arrest Pfail for assault in the second degree.

### 3. Grand Jury Indictment

Defendants next argue that "indictment by a grand jury creates a presumption of probable cause," *Savino*, 331 F.3d at 72, which may only be rebutted by "establish[ing] that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith," *Rothstein v. Carriere*, 373 F.3d 275, 283 (2d Cir. 2004), and that Pfail did not rebut that presumption. However, the jury was instructed on this issue, and "juries are presumed to follow the court's instructions." *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009). Defendants offer no new case law or argument since their original Rule 50(a) motion to show that no reasonable jury could have found that Pfail overcame the presumption of probable cause.

As in their Rule 59 motion, Defendants' entire argument is that the disposal of the sweatshirt and failure to preserve the cart wrangler's identity and cell phone video cannot overcome the presumption of probable cause because Defendants had no obligation to preserve this evidence. Again, Defendants confuse the question of

26

whether there is a legal obligation to preserve evidence in a civil case with whether the officer's failure to preserve that evidence is a relevant fact for the jury's determination of bad faith or the officers' credibility as witnesses.

The jury heard testimony that Officer Massaro had a bloody sweatshirt from the incident and that he took a picture of it, but that he deliberately threw out the sweatshirt that night. Trial Tr. at 145–46. He agreed that he did not know if Pfail's blood was on the sweatshirt, *id.* at 146, and that by destroying it, he made it unavailable for DNA testing by the prosecutors or by Pfail. *Id.* at 147.

The jury was also presented with evidence that the cart wrangler who made the 911 call — which indicated that he believed that he was witnessing three men assault Pfail — was taken back to the substation by Officer Panuthos and Sergeant Iannucci, and that he told them he had a video of the incident. *Id.* at 446–47; 639–42. Officer Panuthos did not recall telling anyone, including anyone in the DA's office, about even speaking with the witness. *Id.* at 448. He claimed that he "determined that there wasn't a video," *id.*, and he did nothing to document the identity of the witness, *id.* at 450. Given that this was the very witness whose 911 call seemed to corroborate Pfail's claim that this was an unprovoked attack or (in the caller's own words) a "beating," it was hardly unreasonable for a jury to infer that the caller's video and/or testimony would have benefited Pfail, and that the officers sent him home without recording his name or contact information for that reason, thus securing the indictment in bad faith.

Relatedly, a jury could have reasonably inferred that if the sweatshirt did not have Pfail's blood or the cart wrangler's video did not actually depict the incident, as the officers now claim, the officers would have preserved those pieces of evidence precisely in order to dispel any inference that they buried or covered up unfavorable evidence — rather than asking the District Attorney's office or Pfail to simply take them at their word about what the evidence would or would not have shown.

Finally, with regards to Officer O'Brien, if the jury did not credit her testimony that Pfail kicked her — which it clearly did not — then it follows that they concluded that she acted in bad faith when she made those same false statements about Pfail's alleged assault on her in seeking his indictment.

Thus, a reasonable jury could have found the presumption of probable cause overcome by the evidence presented at trial.

### 4.  Qualified Immunity as to Malicious Prosecution

Even if the officers did not have probable cause to arrest Pfail on the above charges, Defendants argue that the malicious prosecution verdict should be set aside under Rule 50(b) because there was no evidentiary basis for the jury to determine that the Defendants were not protected by qualified immunity.  Def. Mem. at 35–37.

First, "because qualified immunity is an affirmative defense, it is incumbent upon the defendant to plead, and adequately develop, a qualified immunity defense during pretrial proceedings so that the trial court can determine . . . *which facts material to the qualified immunity defense must be presented to the jury to*

28

*determine its applicability once the case has gone to trial.*" *Blissett v. Coughlin,* 66 F.3d 531, 538 (2d Cir.1995) (emphasis added).  Here, however, Defendants did not move for summary judgment on qualified immunity.  Thus, when the claim was raised pre-trial, they asked this Court to make the determination without any corresponding factual record.

In the context of a Rule 50 motion, while qualified immunity is a legal defense, "[t]o the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question.  If the defendant does not make such a request, he is not entitled to have the court, in lieu of the jury, make the needed factual finding." *Zellner*, 494 F.3d at 368 (internal citation omitted).  Defendants did not request any special interrogatory for the jury on qualified immunity, and thus this Court cannot make any factual findings in place of the jury's.  The Court thus analyzes the issues based only on the facts adduced at trial, weighing all of the evidence in favor of Pfail.

For a claim of malicious prosecution, "qualified immunity protects an officer if he had arguable probable cause to arrest the plaintiff." *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016) (cleaned up).  "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* at 633.  Defendants simply argue that there was "nothing in the record reasonably suggesting that officers would uniformly agree

29

that Plaintiff did *not* resist arrest or commit an assault as defined above." Def. Mem. at 37.

The Court disagrees. Just as a reasonable jury could find no probable cause existed, it could also find no arguable probable cause existed. If the jury were to credit Pfail and not the officers, a reasonable interpretation of his testimony along with the video and the 911 caller's statements is that the three men in plainclothes exited out of an unmarked vehicle, kicked Pfail in the stomach, and immediately tackled him to the ground without identifying themselves or giving him a chance to comply with their commands. No reasonable officers could have believed they had probable cause to charge him with resisting arrest in this scenario.

Additionally, the jury also found that the officers used excessive force against Pfail, making the contact Pfail made with them — as shown on the video and otherwise described in his testimony — legally permissible to protect himself, and thus defeating even arguable probable cause. *See Stevenson*, 31 N.Y.2d at 112; *McLaurin*, 2007 WL 247728, at *1.

Thus, Defendants are not entitled to qualified immunity on the malicious prosecution claim.

B. Due Process

Defendants argue that the judgment against them for abuse of process must be set aside. To the extent that Defendants justify this claim based on the existence of probable cause or arguable probable cause to arrest Pfail, the argument is rejected for the reasons just discussed. Defendants next argue that no evidence was

presented from which a reasonable jury could infer that the prosecution was pursued for a collateral purpose.

To meet that standard, a plaintiff must show "not that defendant[s] acted with an improper motive, but rather an improper purpose—that is, 'he must claim that [the defendants] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution.'" *Taylor v. City of New York*, No. 19-CV-6754 (KPF), 2022 WL 744037, at \*20 (S.D.N.Y. Mar. 11, 2002) (emphasis removed) (quoting *Douglas v. City of New York*, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009)).[3] Under New York law, this collateral objective can include "covering up an unconstitutional use of force, perhaps to forestall personal liability." *Gabilly v. City of New York*, No. 19-CV-11884 (RA), 2021 WL 3667981, at \*4 (S.D.N.Y. Aug. 17, 2021).  It can also include "[f]abricating assault charges to save one's job." *Douglas v. City of New York*, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009).

It is true — and unsurprising — that none of the officers admitted on the stand that they pursued Pfail's criminal prosecution to save their jobs or avoid liability for violating his civil rights.  However, the jury was entitled to draw such inferences after observing the officers' demeanor on the stand, hearing about their failure to preserve evidence potentially relevant to Pfail's prosecution, and watching

---

[3] The Second Circuit case on which Defendants rely for their rule statement and contention that the collateral purpose be the *primary* purpose, *see Doctor's Assocs., Inc. v. Weible*, 92 F.3d 108 (2d Cir. 1996), was specifically looking at an abuse of process claim under *Connecticut* law.  Indeed, directly preceding the quote Defendants use in their memorandum at page 39, the Second Circuit clarifies that it is the "Connecticut law" elements for abuse of process it is defining.  *See id.* at 114.

the video of the incident.  Notably, the jury also knew that if Pfail *had* been found guilty of resisting arrest and assault in the second degree, the officers could not have been held liable in a future civil action. *See* Trial Tr. at 1177 (noting that the second element of a malicious prosecution claim is that the prosecution terminated in Plaintiff's favor).

Thus, the jury had a reasonable basis to find against the officers for abuse of process.

### C. Excessive Force, Assault, and Battery

Defendants next argue that the judgments for excessive force, assault, and battery must be overturned, both because the use of force was "reasonably necessary under the circumstances," Def. Reply at 13, and because they are protected by qualified immunity, Def. Mem. at 41–42.  Again, Defendants' claim relies on viewing the evidence in the light most favorable to them and crediting the officers' testimony over Pfail's.

Defendants argue that the officers "identified themselves, approached to speak to [Plaintiff], and the videos show the rest: the officers moved to pursue him when it seemed he made a move to run.  Then, they took him down to the ground and worked to place him in handcuffs.  It took the efforts of three, then four, then five people, over the course of several minutes, to get Plaintiff into handcuffs.  Why did it take so long to get Plaintiff into handcuffs? Massaro explained: 'we couldn't do it any quicker.'" *Id.* at 42.  In particular, Defendants repeatedly claim that the video "objectively supports the officers' on the scene perception: when they

32

confronted [Pfail], he made a sudden move to the left, as though ready to run." Def.
Reply at 14.

This is by no means the only reasonable interpretation of the video and the
testimony given. The jury could have reasonably found that what the video actually
showed was three men exiting an unmarked car in plainclothes and assaulting Pfail
without identifying themselves or providing him a chance to comply with their
commands. The jury also could have found that one officer kicked Pfail, tackled him
to the ground, and continued to beat him for nearly two minutes while he was on
the ground attempting to protect himself. Indeed, from the Court's own repeated
viewing of the video, it was hardly unreasonable for the jury to find that it
corroborated Pfail's account and not the officers'.

Similarly, though the jury could have credited Officer Massaro's testimony
that it took so long to get Pfail in handcuffs because he was resisting so forcefully,
they could also have watched the video and found that it showed three officers
engaging in an unprovoked attack on Pfail, whose own movements were an effort to
protect his head and body from the assault. The jury could have also credited Pfail's
own testimony that as the officers came towards him from the vehicle, he braced
himself for impact, Trial Tr. at 780, and that in the ensuing struggle, he heard a
female officer tell the others to "break his leg" and bend his leg back as he was
begging for them to stop, *id.* at 783–84. The evidence at trial thus supports the
jury's determination, and accepting Defendants' preferred narrative would usurp
the jury's role as fact finder.

Defendants are also not entitled to qualified immunity on the excessive force and battery claims. As of 2010, it was clearly established in the Second Circuit "that it is a Fourth Amendment violation for a police officer to use significant force against an arrestee who is no longer resisting and poses no threat to the safety of officers or others." *Jones v. Treubig*, 963 F.3d 214, 225 (2d Cir. 2020). Here, a reasonable jury could conclude that Pfail did not resist arrest nor pose any threat, yet the officers used excessive force in kicking him, bringing him to the ground, telling one another to "break his leg," and continuing to beat him once he was on the ground, ultimately leaving him lying motionless in a pool of blood. Such conduct is certainly not protected by qualified immunity.

For the foregoing reasons, the Court denies Defendants' Rule 50 motion for a renewed judgment as a matter of law.

### III. Compensatory Damages

Defendants challenge the jury's award of $1,860,000 in compensatory damages as excessive. However, their reasoning is difficult to parse. Notably, Defendants do not argue that this amount "shocks the conscience" on this record. Rather, they appear to raise only one issue: that Pfail's physical injuries, specifically his brain injuries, were not proximately caused by Defendants' actions, but rather resulted from a "separate and unconnected incident that occurred over a year later." Def. Mem. at 43. This incident, referred to at trial as "the 2013 incident" or "the Garden City incident," is described in a 2016 complaint Pfail filed in a different civil rights lawsuit in this court at Docket No. 16-CV-3832.

34

First, to the extent that Defendants challenge Dr. Berrill's testimony as to Pfail's TBI because he did not consider the 2013 incident when he made his diagnosis, that is simply a re-litigation of the *Daubert* motion on which this Court has already ruled.

Otherwise, Defendants correctly note that the 2013 incident provided a basis for them to argue to the jury that at least some of Pfail's symptoms stemmed from that incident. That is precisely why this Court denied Plaintiff's motion to preclude that evidence and allowed defense counsel to cross both Pfail and Dr. Berrill at great length on the statements in the civil complaint about the 2013 incident and its impact on Pfail. *See* Tr. 1548–71; 1800–01. However, it does not follow that simply because Defendants have raised a possible alternative cause of Pfail's injury, the jury was required to accept their theory — namely, that Pfail sustained a TBI in 2013, but not during his arrest by Defendants in 2014.

This is especially so given that Defendants could have called their own expert to testify that Pfail's injuries stemmed from 2013 as opposed to 2014, but chose not to do so. Indeed, Defendants presented no affirmative evidence that the 2013 event caused a TBI. Rather, they asked the jury to infer that that was the case based on assertions by counsel that Pfail signed in a 2016 civil complaint. The jury was entitled to draw its own conclusions.

Defendants make no other discernible argument supporting their claim that the jury's award was excessive or improper. Indeed, Pfail and his mother Eileen presented substantial, detailed evidence to support this award of damages as

specifically tied to the injuries he sustained during his encounter with Defendants in 2014. As this Court instructed the jury, compensatory damages can stem from pain, suffering, disability, disfigurement, mental anguish and/or loss of capacity for enjoyment of life. Trial Tr. at 1963; *see Bergerson v. New York State Off. of Mental Health*, 652 F.3d 277, 286 (2d Cir. 2011).

Eileen testified that on the day of the 2014 incident and just after, "[Pfail] was a mess . . . his whole face. He was all banged up." *Id.* at 1386. She said that "[h]e was very much out of it . . . he just seemed very confused and he couldn't hold a conversation. He just was not right." *Id.* 1389. Pfail himself testified about the pain he endured, describing that when he looked in the mirror following the incident, "it looked like [his] face was painted red." *Id.* at 1441.

Eileen also testified to Pfail's long-term emotional distress, saying that "[w]hen he would eventually sleep, [she] would hear screaming during the night because he was having night terrors and then he would get up and he would be soaking we from sweating so much." *Id.* at 1390. Notably, she specified that these night terrors were not happening before the 2014 incident. *Id.* She also testified that Pfail could no longer hear a siren without becoming anxious and upset. *Id.* at 1399. She further described how the 2014 incident affected Pfail's depression, saying that "before [the incident] he at least was going out, doing things . . ." but that after, "he would spend the day in bed. . . . He can't function." *Id.* at 1398–99, 1391.

Pfail and Eileen also testified as to the damage caused by the officers' malicious prosecution and abuse of process. For example, Eileen stated that the criminal trial depressed and frustrated Pfail, *id.* at 1393, that seeing his mugshot on television was distressing for him, *id.* at 1391, and that he could not stop crying. *Id.* at 1392. Pfail testified that there were social media posts on Facebook, Twitter, and LinkedIn regarding his arrest, and that his mugshot made him embarrassed and ashamed. *Id.* at 1432–33.

Thus, viewing the evidence presented in the light most favorable to Pfail, the Court cannot find that the compensatory damages award here "shock[s] the judicial conscience." *Pescatore*, 97 F.3d at 18 (quoting *Matthews v. CTI Container Transp. Int'l Inc.*, 871 F.2d 270, 278 (2d Cir. 1989)).

## IV.    Punitive Damages

Finally, Defendants ask this Court to set aside or substantially reduce the jury's award of punitive damages. The jury awarded punitive damages of $293,580 each against Officers Panuthos, Massaro, and Iannucci, and $143,550 against Officer O'Brien. Defendants' motion is denied.

As a preliminary matter, Defendants argue that since the amounts against all four Defendants were "nearly identical," the jury must have given the awards reflexively without consideration of each officer's state of mind. First, it should be noted that the award against Officer O'Brien was less than half of the other officers', reflecting the jury's assessment of her relative culpability. Moreover, it was perfectly reasonable for the jury to assign equivalent, higher punitive damages

against Panuthos, Massaro and Iannucci given that it found that those three officers engaged in the same conduct at the same time in assaulting and using excessive force against Pfail.  In any case, Defendants again cite to no law authorizing a Court to find that a jury did not make an individualized assessment simply because it assigned the same punitive damages to three Defendants involved in the same conduct.

A jury has "wide discretion" to award punitive damages, and a district court "may refuse to uphold a punitive damages award" only when the amount is "so high as to shock the judicial conscience and constitute a denial of justice." *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996) (quoting *Hughes v. Patrolmen's Benevolent Ass'n of N.Y., Inc.*, 850 F.2d 876, 883 (2d Cir. 1988)).  The "guideposts" for a court in deciding whether an award of punitive damages is excessive are: (1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases.  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75 (1996) ("the Gore factors").  The Court considers each of these factors in turn.

A. Degree of Reprehensibility

The degree of reprehensibility is "perhaps the most important" factor.  *Gore*, 517 U.S. at 575.  The Second Circuit has instructed district courts to look at three factors with regard to each defendant: "(1) whether a defendant's conduct was marked by violence or presented a threat of violence, (2) whether a defendant's

38

conduct evinced trickery or deceit as opposed to mere negligence, and (3) whether the record supports a finding of intentional malice." *Jennings v. Yurkiw*, 18 F.4th 383, 390 (2d Cir. 2021).

Defendants first state that because they did not brandish weapons, use racial slurs, or seek to humiliate Pfail, their actions could not have involved "reckless or callous indifference" to Pfail's rights. Def. Mem. at 45 (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). However, they cite to no caselaw which requires these specific elements to be present to find that the conduct was reprehensible.

By contrast, the record is replete with evidence weighing against the Defendants on all three *Jennings* factors. The jury heard evidence from which it certainly could conclude that Massaro, Panuthos, and Iannucci used gratuitous violence against Pfail. This Court has already extensively discussed that evidence, and will here simply reiterate that Pfail testified that the first contact between him and the officers was a foot to his abdomen, at which point he fell face-first into the vestibule of the Fairway. Trial Tr. at 782–83. When he was on the ground, he testified that all the men were on top of him and he could feel the punching. He said that someone took his head and slammed it on the floor of the vestibule, and felt something blunt hitting him in the back of the head numerous times. *Id.* at 783. Video evidence, photographs, and the 911 caller's descriptions of a "beating" all corroborated his account of Defendants' use of violence.

The jury also concluded that the officers had no probable cause to believe Pfail assaulted them or resisted arrest, yet charged him with those felony crimes.

And as discussed, the jury was presented with evidence that the Officers acted with malice and deceit in pursuing Pfail's prosecution, including by making false statements about his conduct and by failing to preserve evidence, potentially with the intent to suppress exculpatory evidence.  The jury also saw all of the officers testify and apparently concluded that they were not being truthful in their claims that Pfail assaulted them and resisted arrest.

Presented with the above evidence of Defendants' gratuitous violence, deceit, and intentional malice, the jury certainly could have concluded that the officers' conduct was reprehensible.

### B.  Ratio of Punitive Damages to Compensatory Damages

The second *Gore* factor is the ratio of punitive damages to the compensatory damages.  Notably, the Second Circuit in *Jennings* itself found "nothing untoward about the 1:4 ratio between compensatory and punitive damages." *Jennings*, 18 F.4th at 392.  The ratio here does not even approach that.

Defendants' argument is simply a re-litigation of their motion to remit compensatory damages, *see* Def Mem. at 46. ("Where the compensatory award is already excessive and likely overstated, any attempt to calibrate punitive damages to that award becomes equally flawed."), which the Court has already addressed.  Thus, the Court finds no basis to remit punitive damages on this basis.

### C.  Difference with Comparable Cases

The final *Gore* factor instructs us to compare the punitive damages to potential civil and criminal sanctions or awards in other civil rights cases.  As a

preliminary matter, Defendants in their initial brief compare the total punitive damages here against all officers—over one million dollars—to the damages in other cases. But the cases they cite analyze amounts against each officer individually. The correct comparator is therefore the punitive damages against individual officers in this case, the highest of which is $293,580.

First, Defendants argue that because no officer was internally disciplined or referred for criminal prosecution, there was an absence of sanctions, and thus no comparative criminal or civil sanctions. This argument misreads *Gore*. *Gore* instructed the district court to look at "statutory fines *available in* [the State] or elsewhere for similar malfeasance." *Gore*, 517 U.S. at 584 (emphasis added). It decidedly did not instruct district courts to anchor punitive damages on any criminal or civil fines that were actually *imposed* on the defendants. Moreover, the Second Circuit has explicitly directed district courts to look to *federal* criminal law in § 1983 cases. *See Jennings*, 18 F.4th at 393 ("Where a jury imposes punitive damages for a violation for § 1983, the penalties imposed under federal criminal law offer a useful comparison."). And as Pfail points out, if the officers had been prosecuted for perjury under 18 U.S.C. § 1621, a federal felony, they each could have been fined up to $250,000.

Defendants next argue that this award is excessive compared to similar cases. The Court first cautions that while it is "helpful in deciding whether a particular punitive award is excessive to compare it to court rulings on the same question in other cases," *Payne v. Jones*, 711 F.3d 85, 104 (2d Cir. 2013), a court's

41

task is not to simply "balance the number of high and low awards and reject the verdict . . . if the number of lower awards is greater," *Ismail v. Cohen*, 899 F.2d 183, 187 (2d Cir. 1990).

Defendants cite to this Court's opinion in *Martinez v. City of New York*, No. 16-CV-79 (NRM), 2023 WL 4627739, at *18 (E.D.N.Y. July 19, 2023), for the proposition that the Second Circuit set $175,000 as the upper range of punitive awards against a single officer. *See* Def. Mem. at 47. This is decidedly not what *Martinez* states. For Defendants neglect to mention the sentence immediately following their quoted line, which reads: "However, since that time, the Second Circuit made clear in *Jennings* that courts must *adjust previous awards for inflation* before comparing those awards with the jury's award in the case before them." *Martinez*, 2023 WL 4627739, at *18 (emphasis added). And as the *Martinez* opinion went on to note, the Second Circuit in *Jennings* affirmed a $250,000 award against a single officer. *Id.* (citing *Jennings*, 18 F.4th at 393).

Furthermore, *Jennings* left ample room for an even higher award on facts such as these. In *Jennings*, the defendant police officers assaulted the plaintiff, then took steps to conceal that assault. Yet the Second Circuit stated that its award would be reasonable "even if [the court] were to ignore that [the Defendant] and the other officers took steps to conceal their use of excessive force." *Jennings*, 18 F.4th at 393–94. In other words, *Jennings* indicates that an award of punitive damages against a single officer in a case involving excessive force *and* an effort to conceal that excessive force could reasonably be *higher* than $250,000 in 2021 dollars.

42

The underlying damages trial in *Jennings* was held in April of 2019, *see Jennings v. Yurkiw*, 14-CV-6377 (SGG), 2019 WL 6253813, at *2 (E.D.N.Y. Nov. 22, 2019). In the instant trial, the jury delivered its verdict in May of 2025. Adjusted for inflation, $250,000 in May of 2019 has the same buying power as $313,817.89 in May of 2025. Bureau of Labor Statistics CPI Inflation Calculator, https://www.bls.gov/data/inflation_calculator.htm. Thus, the jury's punitive awards against each individual officer in this case, adjusted for inflation, is *less* than the amount that the Circuit in *Jennings* already found reasonable.

The Court has reviewed the other cases Defendants rely upon, and finds that they are similarly distinguishable.[4] As such, following the Second Circuit's direction in *Jennings* that $313,817.89 in today's dollars would not be excessive in a case that involved excessive force but did *not* involve deceit or cover-up, the punitive awards here are clearly not excessive in light of the multiple civil rights violations found by the jury and the nature of those violations.

---

[4] For example, Defendants cite to the recent case of *McDevitt v. Suffolk County*, No. 16-CV-4164 (GRB), 2024 WL 1270811, at *10 (E.D.N.Y. Mar. 26, 2024), where a punitive damages award was lowered from $450,000 to $100,000. *See* Def. Mem. at 47. However, while *McDevitt* involved claims of excessive force and malicious prosecution, the court specifically noted that the "punitive award relates solely to plaintiff's malicious prosecution claim, emanating from acts which, though highly reprehensible, were not marked by violence or a threat of violence." *McDevitt*, 2024 WL 1270811, at *8. The court in *McDevitt* also found the ratio to weigh against the plaintiff, as the compensatory award was only $150,000. *Id.* Thus, the facts are not comparable to the facts here, where the compensatory award was much higher, and there is nothing to indicate that the punitive damages were not also awarded for the excessive force claim.

## CONCLUSION

For the foregoing reasons, Defendants' post-trial motions are denied in full.


                              */s/ Nina R. Morrison*
                              NINA R. MORRISON
                              United States District Judge

Dated:      November 13, 2025
             Brooklyn, New York